IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Joseph H. Sands,

                        Petitioner,                       Case No. 1:14 CV 0251

    v.

                                                         MEMORANDUM OPINION AND
                                                         ORDER

Kimberly Clipper, Warden[1],

                        Respondent.


**INTRODUCTION**

On February 6, 2014, *pro se* Petitioner Joseph H. Sands filed a petition for a writ of habeas corpus with this Court pursuant to 28 U.S.C. § 2254 ("Petition") (Doc. No. 1). The Court referred the matter to Magistrate Judge Baughman for a Report and Recommendation ("R&R"). Sands then filed a motion requesting Magistrate Judge Baughman to stay his Petition, which was denied. (*See* Doc. Nos. 13, 16). Sands twice objected to this denial. (Doc. Nos. 17, 20). On February 12, 2014, the Magistrate Judge recommended I dismiss the Petition as time-barred. (Doc. No. 19). Sands then requested a 90-day extension to file objections to the R&R. (Doc. No. 21). This motion was rendered moot when Sands filed timely objections six days later, on February 26, 2015. (Doc. No. 22). On March 12, 2015, Sands filed a supplemental objection calling into question Magistrate Baughman's conduct for not ruling on his numerous objections. (Doc. No. 24). For the reasons stated below, I adopt the Magistrate Judge's recommendations as set forth in the R&R and reject Griffin's objections.

---

[1] Sands was in custody at a federal prison in Kentucky when he filed the habeas petition before this Court. Thus, he named the warden of that institution as the Respondent. However, because he seeks to challenge his Ohio conviction in this habeas proceeding (and he has since been moved to state custody), the proper Respondent is warden of the state correctional facility in which Sands is currently incarcerated. Rule 2(b) of the Rules Governing § 2254 cases. Thus, the Court has captioned the case to reflect the proper Respondent, Warden Kimberly Clipper.

## FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings were erroneous. 28 U.S.C § 2254(e)(1); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial record. *Mitzel*, 267 F.3d at 530. Because Sands has failed to present such evidence, I adopt the facts as set forth by the Eleventh District Court of Appeals of Lake County, Ohio:

> On April 1, 2006, Jason Green contacted Madison Township Detective Mark Parisi and requested that they meet outside of his hometown, North Perry Village. At the meeting, Mr. Green informed him that his friend, Mr. Sands, and Mr. Sands' girlfriend, Dawn Holin, were conspiring to kill four local officials. The intended targets were Painesville Municipal Court Judge Michael Cicconetti, North Perry Police Chief Denise Mercsak, North Perry Mayor Tom Williams, and North Perry Prosecutor Joseph Gurley.
>
> Mr. Sands and Mr. Green became friends several years ago when Mr. Green moved next door to JB Performance. They would see each other at least daily, visit each other's homes and of course, hang out at JB Performance.
>
> Both Mr. Green and Mr. Sands had an embattled history over the years with the North Perry Village Police and Mayor Williams, and both believed they were being unfairly harassed. There were incidents and altercations where the police would be called to Mr. Sands' automotive repair shop, JB Performance, which he owned with his girlfriend and co-conspirator, Ms. Holin. Mr. Green also had a lengthy criminal history, and faced various charges in the past few years for theft, menacing, animal cruelty, and littering, to name a few among the many. Mr. Green and Mr. Sands purchased a recording device and would record their conversations with the police and the mayor, in the hopes of proving they were being harassed. They also talked of a possible civil suit against the village. In fact, Mr. Green had recorded one such conversation with Officer Rex Buchs, who told him that the police would probably leave him alone if he stopped hanging out with Mr. Sands.
>
> In the few months prior to the rise of the conspiracy, Mr. Green, his girlfriend, Janice Dotson, Mr. Sands, and Ms. Holin were prosecuted on various misdemeanor charges. Both Mr. Sands and Ms. Holin were convicted for failing to file income taxes. Mr. Sands served approximately five days in jail, followed by electronically monitored house arrest for ten days. He was then convicted for failure to pay sales tax. This was the sentencing that was pending at the time of his arrest for this conspiracy. His sentencing was set for April 20, 2006, and his idea was that Judge

Cicconetti would be intimidated by the deaths of Mayor Williams and Prosecutor Gurley. Ms. Holin's sentencing was set for April 20, to be followed three days later by Mr. Green's sentencing for the menacing charge. Mr. Green's girlfriend, Ms. Dotson, was facing a barking dog charge.

After hearing Mr. Sands lay out this chilling plot, Mr. Green went to the police. Since both Mr. Green and Mr. Sands had been voluntary informants for Detective Parisi in the past, Mr. Green felt he could trust the detective with this information. Mr. Green told the detective that Mr. Sands wanted to kill the victims by building homemade pipe bombs that were going to be loaded with shrapnel and ether, as well as possibly, homemade napalm. The plan was to kill Mayor Williams in the first few weeks of April by throwing a pipe bomb through the bay window of his home. The next target was to be Prosecutor Gurley. Then, after Mr. Sands was sentenced for failing to file his taxes on April 20, they would move on to the judge. By killing Mayor Williams and Prosecutor Gurley, Mr. Sands hoped to intimidate Judge Cicconetti to impose a lesser sentence.

Detective Parisi equipped Mr. Green with a recording device to determine the seriousness of the threat. After meeting with Mr. Sands at JB Performance, Mr. Green immediately returned and provided Detective Parisi and Detective Timothy Doyle with a recording of a conversation he had with Mr. Sands, in which the two discussed the plan, the bomb, and possible alibis. Mr. Sands' discussion was very descriptive, detailed and vulgar.

With this recording, the threat was deemed serious, and the Federal Bureau of Investigation and the Bureau of Alcohol, Tobacco, Firearms and Explosives were contacted. The FBI provided surveillance of Ms. Holin and Mr. Sands up to the point of arrest, and wanted to ensure this was not part of a larger domestic terrorist group. They also provided a GPS for Mr. Green's minivan. Likewise, the ATF was concerned from the very nature of the pipe bombs, and two days after the initial contact by Mr. Green, ATF took over the surreptitious recordings for the Madison Police.

The intended targets were informed of the threat against them and surveillance was provided until Mr. Sands and Ms. Holin were arrested. Some of the targets and their families left their homes in fear of their lives until the ordeal was over.

Mr. Sands devised all facets of the plan. His firebombing target was Mayor Williams. He was adamant that Mr. Green would drive, so he could run and throw the bomb into Mayor Williams' home. At the request of the police, Mr. Green suggested involving a third party, but Mr. Sands did not want anyone else involved. Mr. Sands also developed their alibi that they had gotten drunk and the three just stayed at the Sands/Holins' home. Since their history with the village was notorious, Mr. Sands knew they would be under suspicion. Because of that they would hit Prosecutor Gurley a month after Mayor Williams, and then they would possibly have to wait as long as a year to shoot Judge Cicconetti.

Between April 4 and April 9 of 2006, Mr. Green continued to record conversations with Mr. Sands, recording approximately seven conversations. He was directed by the police to "act normal" and to follow Mr. Sands' directions. During the second of two April 4th recordings, Mr. Sands showed Mr. Green a container of gun powder and explained that he was going to build the pipe-bomb out of three-inch galvanized pipe, and attach four cans of ether to it. During this second conversation Mr. Sands and Ms. Holin discussed purchasing more gun powder and a fuse. He also discussed how to build homemade napalm, which he learned from one of his CB radio acquaintances, Mr. Pongrass. He also inquired over the CB radio where he could purchase gunpowder. Even though it was readily available at hunting and sporting goods stores, he chose to purchase the powder from an acquaintance, Mr. Gau. Per Mr. Sands' direction, Ms. Holin purchased the powder from Mr. Gau.

The following day, before a dry-run directed at the mayor's home, Ms. Holin gave Mr. Green a list with Prosecutor Gurley's name and address, as well as the name of the judge, and asked him to locate the judge's address. Mr. Sands and Mr. Green then conducted a "dry-run" of Mayor Williams' home. At some point, Chief Mercsak saw Mr. Sands drive by her home, which she thought was odd since she had never seen him in the area before. North Perry Village is a very small town, about four square miles, with fewer than one thousand residents. She waved to Mr. Sands as he drove about five miles under the speed limit, but according to her, he did not respond. Mr. Sands testified that he drives his bike on that route all the time, and that he was driving to his business or home, and that he did wave back when he saw Chief Mercsak wave.

Ms. Holin searched for a shop to buy the pipe after they agreed it would be best to pay in cash at a store that was not in the local area. Mr. Sands and Ms. Holin gave Mr. Green two $50 bills to purchase the galvanized pipe and four end caps. Mr. Green traveled to two different hardware stores in Willoughby with ATF following him in order to document the purchases. Mr. Green drove the items back to JB Performance and stored them in the bay of Mr. Sands' shop.

By Friday, April 7, the three had everything they would need with the exception of the wick to light the pipe bomb. To purchase this, Mr. Sands wanted Mr. Green to accompany him to a store some sixty miles away in Ashland, Ohio, called Fin, Fur, & Feather. Like the pipe, he did not want to make the purchase in the local area, where everyone seemed to know each other. Ms. Holin provided them with directions. Unbeknownst to Mr. Sands, ATF, the police, and the FBI were following them, with a plan to arrest the pair upon purchase. On the way to Ashland, Mr. Sands told Mr. Green they could not use the pipe they purchased because it was too identifiable. The police could easily discover that Mr. Green had purchased the pipe, thus, Mr. Sands suggested getting some pipe from his brother-in-law.

At the store, the two looked at some ammunition, picked up the wick and some 2-way radios. Mr. Sands purchased fifteen feet of wick and a 2-way radio, and Mr. Green purchased a two-way radio as well. When they left the store, both were arrested and placed in separate vehicles. Mr. Green did not know in advance of the plans for arrest.

> At the time of arrest, Mr. Sands consented to a search of his home and business, which produced all of the equipment needed to make a pipe bomb. The search of his shop produced the now threaded end-caps and the long steel pipe that Mr. Green had purchased, as well as ether. A search of Mr. Sands' home produced a container of smokeless gun powder, as well as large quantities of ammunition, several rifles, shotguns, and handguns. Mr. Sands told the authorities that he did not even know how to make a pipe bomb, although the over seven recorded conversations between him and Mr. Green begged otherwise. He was mirandized, but then waived his right to remain silent. He claimed that the gunpowder was to reload shotgun shells, although those shells were never found; that the pipe was going to be used to fix his bathroom, although that is not the type of pipe used for plumbing; and that the wick was going to be used to blow up some "varmints."
>
> Mr. Sands was subsequently charged with two counts of engaging in a pattern of corrupt activity, first degree felonies in violation of R.C. 2923.32(A)(1); four counts of conspiracy to commit aggravated murder, felonies of the first degree in violation of R.C. 2923.01(A)(1); four counts of conspiracy to commit aggravated arson, felonies of the second degree in violation of R.C. 2909.02(A)(1); and four counts of conspiracy to commit aggravated arson, felonies of the third degree in violation of R.C. 2923.01(A)(2). The counts of aggravated murder and aggravated arson were for each of the four intended targets. During trial, the two counts of engaging in a pattern of corrupt activity were merged.
>
> Mr. Sands, in his defense, testified that the plan was Mr. Green's idea and he was merely a cohort. He was, in fact, trying to "control" Mr. Green to prevent him from carrying out the plan.
>
> After an almost two week trial, the jury found Mr. Sands guilty on six counts of the indictment, finding him guilty of engaging in a pattern of corrupt activity, three counts of conspiracy to commit aggravated murder as they related to Judge Cicconetti, Mayor Williams, and Prosecutor Gurley; as well as two counts of conspiracy to commit aggravated arson as they related to Mayor Williams and his property. For sentencing purposes, the conspiracy counts were merged as they were part of one single agreement pursuant to R.C. 2923.01(F). Ultimately, the court sentenced Mr. Sands to ten years on the count of engaging in a pattern of corrupt activity, and ten years on the merged count of conspiracy, to be served consecutively to each other, for a total term of imprisonment of twenty years.

(Doc. No. 7-1 at 159-65).

## PROCEDURAL BACKGROUND

Magistrate Judge Baughman accurately and comprehensively set forth the procedural background of this case, and I adopt that section of the R&R in full. (Doc. No. 19 at 2-4).

5

Briefly, Sands, through counsel, filed a timely direct appeal on January 10, 2007. On December 31, 2008, the state appellate court overruled Sands' assignments of error and affirmed the judgment of the trial court. Sands failed to perfect a timely appeal to the Ohio Supreme Court and his sentence became final 45 days later, on February 14, 2009.

On September 27, 2010, Sands, through new counsel, filed a notice of appeal and motion for leave to file a delayed appeal with the Ohio Supreme Court. The Ohio Supreme Court denied Sands' motion and dismissed the case. Subsequent to this dismissal, and nearly five years after his conviction, Sands, *pro se*, filed an untimely motion to vacate or set aside his conviction and an untimely application to re-open his appeal. Both were denied and Sands did not pursue either claim to the Ohio Supreme Court.

On January 30, 2014, Sands executed and filed his Petition raising four grounds for relief. (Doc. No. 1). Sands then filed supplemental authority, in which he presented an additional three grounds for relief. (Doc. No. 3). Sands does not dispute that his federal habeas petition was untimely. Rather, Sands argues he is entitled to equitable tolling because he diligently pursued his rights, and that he is actually innocent of RICO and conspiracy charges. (Doc. No. 22).

**VARIOUS MOTIONS AND ABEYANCE REQUESTS**

At the outset, I will address Sands various objections and motions unrelated to the untimeliness of his Petition. On January 7, 2015, Sands requested that his Petition be held in abeyance until he was transferred to state custody (Doc. No. 13), which Magistrate Judge Baughman denied (Doc. No. 16). Sands twice objected to this denial. (Doc. Nos. 17, 20). I find that Magistrate Judge Baughman correctly denied this request as Sands' case was ripe for adjudication. Therefore, I adopt the Magistrate Judge's ruling denying Sands' request to stay his case while he transferred prisons. (Doc. No. 16).

Sands also requested a 90-day extension to file objections to the Magistrate Judge's R&R, which was rendered moot when he filed timely objections six days later on February 26, 2015. (Doc. Nos. 21, 22). Nevertheless, Sands filed an objection to the Magistrate Judge's conduct for not responding to his request for a 90-day extension. (Doc. No. 24). However, I, not the Magistrate Judge, was tasked with ruling on the 90-day extension request, which, as already noted, became extraneous when Sands filed timely objections. Accordingly, Sands objections with respect to his abeyance request and his 90-day extension are rejected.

## STANDARD

A district court must conduct a de novo review of "any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition, receive further evidence, or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

## ANALYSIS

The Antiterrorism and Effective Death Penalty Act, Pub. 1. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA") established the one-year statute of limitations at issue. The applicable statute of limitations under the AEDPA, for one whose conviction became final before the effective date of the statute, is one year from the effective date. 28 U.S.C. § 2254(d)(1); *Brown v. O'Dea*, 187 F.3d 572, 575–77 (6th Cir. 1999). Subsection 2244(d)(1)(A) indicates that the federal habeas statute of limitations runs from the date on which the state court judgment becomes final by the conclusion of direct review or the expiration of the time for seeking such review, whichever is later.

The AEDPA statute of limitations is not absolute; it can be statutorily or equitably tolled. Equitable tolling allows courts to review time-barred habeas petitions "provided that 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that

litigant's control.'" *Robinson v. Easterling*, 424 F. App'x 439, 442 (6th Cir. 2011) (quoting *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010)).

To demonstrate he is entitled to equitable tolling, a habeas petitioner must establish: 1) he has diligently pursued his rights; and 2) "that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010); *see also Robison*, 424 F. App'x at 442 (explaining that prior to *Holland*, the Sixth Circuit used the five factors elicited in *Dunlap v. U.S.*, 250 F.3d 1001 (6th Cir. 2001), to determine equitable tolling under AEDPA). Such equitable tolling, however, is rare, granted sparingly, and evaluated on a case-by-case basis, with the petitioner retaining the "ultimate burden of persuading the court that he or she is entitled to equitable tolling." *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011); *King v. Bell*, 378 F.3d 550, 553 (6th Cir. 2004).

Here, Sands argues he was diligent in pursing his rights. Specifically, Sands alleges that "paid counsel blatantly lied to [him] concerning the time period for filing a petition for certiorari to the Ohio Supreme Court, and even about filing the petition in general." (Doc. No. 22 at 3). He also claims that he "worked diligently, even furiously, to find an attorney who was willing to take his case, and to file a petition for certiorari." (*Id.*). To the extent Sands is arguing he was entitled to the assistance of appointed counsel on his appeal to the Ohio Supreme Court, that argument fails. It is well settled that there is no right to counsel for an appeal to the Ohio Supreme Court. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985) (a petitioner only has a right to counsel on direct appeal). Therefore, Sands cannot claim he was denied effective assistance in that regard.

Moreover, it remains that Sands' diligence in retaining counsel to cover his Ohio Supreme Court filings in 2009 and 2010 does not excuse his inaction in pursuing his federal habeas claim until 2014. As the Magistrate Judge points out, Sands cannot now assert that the purported ineffective assistance of his Ohio counsel in not timely filing an appeal to the Ohio Supreme Court also somehow excuses any subsequent failures and defaults in bringing a timely federal habeas action. In

8

addition, Sands has failed to demonstrate, nor does he claim, that an "extraordinary circumstance" stood in his way to prevent the timely filing of his federal habeas action. Although it may seem harsh, it bears noting that neither a petitioner's *pro se* status nor a professed ignorance of filing deadlines will justify equitable tolling of the limitations period. *Johnson v. United States*, 544 U.S. 295, 311 (2005); *Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991) ("[I]gnorance of the law alone is not sufficient to warrant equitable tolling.").

Equitable tolling for ineffective assistance claims is a high standard, used sparingly. Here, Sands makes conclusory allegations that his attorney failed to advise him of the Ohio Supreme Court deadlines. However, the Sixth Circuit has declined to allow equitable tolling for ineffective assistance even in circumstances when a petitioner's attorney failed to inform him of his appellate decision for more than a year after it was issued. *Robinson*, 424 F. App'x at 440-43; *see also Keeling v. Warden*, 673 F.3d 452, 463 (6th Cir. 2012); *Winkfield v. Bagley*, 66 F. App'x 578, 583-84 (6th Cir. 2003) (no equitable tolling when petitioner's attorney misled him into believing his appeal was still pending before state court); *Elliot v. Dewitt*, 10 F. App'x 311, 312-13 (6th Cir. 2001) (no equitable tolling when petitioner's attorney and the state court allegedly failed to inform him that a decision had been rendered affirming his conviction). This, coupled with Sands' failure to establish that he diligently pursued his federal habeas claims, persuades me that Sands' is not a case which warrants equitable tolling.

Sands' claim of actual innocence also fails. Recently, the Supreme Court determined the AEDPA statute of limitations may be subject to equitable tolling for a showing of actual innocence under the "miscarriage of justice" standard set forth in *Schlup v. Delo*, 513 U.S. 298 (1995). *McQuiggen v. Perkins*, 133 S. Ct. 1924 (2013). However, such was already the existing law in the Sixth Circuit under *Souter v. Jones*, 395 F.3d 577, 588-89 (6th Cir. 2005). Actual innocence does not mean actual innocence in the practical sense of the term; rather, actual innocence, if proven, is a "gateway" that

9

allows courts to reach the merits of other claims that would otherwise be time-barred or defaulted. *Schlup*, 513 U.S. at 316.

In determining whether a petitioner has met the requirements for establishing a cognizable claim of actual innocence for purposes of equitable tolling, the district court must make a probablistic determination about what reasonable, properly instructed jurors would do. *Souter*, 395 F.3d at 588-89. A petitioner does not meet the standard unless he persuades the district court that in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *Mc.Cray v. Vasbinder*, 499 F.3d 568, 571-72 (6th Cir. 2007) (quotations omitted); *see also Souter*, 395 F.3d at 602.

"The *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327). The petitioner must present new evidence of innocence that is so strong a reviewing court cannot have confidence in the outcome of the trial. *Schlup*, 513 U.S. at 327. New evidence may be "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id.* at 324.

Sands argues his untimeliness should be excused because he is "factual[ly] innocent" of the Ohio RICO and conspiracy charges. (Doc. No. 22 at 16-25). However, he has not provided any credible, new evidence to support this conclusion. Instead, Sands argues the prosecution misapplied the law to his case. Even so, legal insufficiency is not considered a miscarriage of justice excuse for equitable tolling under the actual innocence standard. *Bousley v. Unites States*, 523 U.S. 614, 623 (1998). Accordingly, Sands has failed to show actual innocence for purposes of equitable tolling.

10

## CONCLUSION

For the reasons stated above, I adopt Magistrate Judge Baughman's R&R. Sands' objections are rejected (Doc. Nos. 17, 22, 24), Respondent's motion to dismiss is granted (Doc. No. 7), and the Petition is dismissed as time-barred (Doc. No. 1).

## CERTIFICATE OF APPEALABILITY

A habeas corpus petitioner is not entitled to a certificate of appealability as a matter of right, but must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner need not demonstrate he should prevail on the merits. Rather, a petitioner must demonstrate "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). Where a claim is procedurally barred, a certificate of appealability should only issue after a showing that "jurists of reason would find it debatable" whether 1) "the petition states a valid claim of the denial of a constitutional right" and 2) "the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Sands' Petition was denied on procedural grounds, as I found his claims to be time-barred. *See Chapman v. Moore*, 406 F. Supp.2d 835, 838 (N.D. Ohio 2005). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Slack*, 529 U.S. at 484; *see also Carter v. Maclaren*, No. 12-cv-160, 2012 WL 1611255, at *1 (W.D. Mich. May 8, 2012). For this reason, I deny Sands a certificate of appealability. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

So Ordered.

    s/ *Jeffrey J. Helmick*
United States District Judge

11